## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

2019 AUG 27  AM 10: 07

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel. JEFFREY BOUDETTE | ) | |
| and JAMES MEZHERITSKIY | ) | |
|  | ) | |
| STATE OF FLORIDA | ) | |
| ex rel. JEFFREY BOUDETTE | ) | |
| and JAMES MEZHERITSKIY | ) | Case No. 6:19-CV-1669-ORL-41-LRH |
|  | ) | **JURY TRIAL DEMANDED** |
| Plaintiffs-Relators, | ) | **FILED UNDER SEAL** |
|  | ) | |
| v. | ) | |
|  | ) | |
| SEBASTIAN PHARMACY, LLC, d/b/a | ) | |
| SEBASTIAN DISCOUNT PHARMACY; | ) | |
| ALKESH SHASTRI; HINA SHASTRI; | ) | |
| MALABAR PHARMACY, LLC, d/b/a | ) | |
| MALABAR DISCOUNT PHARMACY;  and | ) | |
| TITUSVILLE PHARMACY, LLC, d/b/a | ) | |
| TITUSVILLE DISCOUNT PHARMACY, | ) | |
|  | ) | |
| Defendants. | ) | |

## FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL

1.     Relators Jeffrey Boudette and James Mezheritskiy ("Relators") bring this

action on behalf of themselves, the United States of America, and the State of

Florida against Defendants Sebastian Pharmacy, LLC, d/b/a Sebastian Discount

Pharmacy ("Sebastian"), Alkesh Shastri ("Defendant Alkesh"), Hina Shastri

("Defendant Hina") (together, "the Shastris"), Malabar Pharmacy, LLC, d/b/a

Malabar Discount Pharmacy ("Malabar"), and Titusville Pharmacy, LLC, d/b/a

Titusville Discount Pharmacy ("Titusville") (collectively, "Defendants") for violations

of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("federal FCA"), and of the

S-1

Florida False Claims Act, sections 68.081, *et seq.*, Florida Statutes ("Florida FCA") (collectively, the "False Claims Act").

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and (b), and 28 U.S.C. §§ 1331, 1345.

3.      Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a), as one or more of the defendants transacts business in this jurisdiction and violations of the False Claims Act described herein occurred in this district.

## COMPLIANCE WITH PROCEDURAL REQUIREMENTS

4.      As required by the federal FCA, 31 U.S.C. § 3730(b)(2), Relators have provided to the Attorney General of the United States and the United States Attorney for the Middle District of Florida a statement of all material evidence and information related to the Complaint ("Disclosure Statement"). As required by the Florida FCA, Relators have provided the Disclosure Statement to the Attorney General and Chief Financial Officer for the State of Florida.

5.      The Disclosure Statement includes attorney-client communications and work product of Relators' attorneys and is submitted to the Attorney General of the United States and the United States Attorney for the Middle District of Florida in their capacities as potential co-counsel in this litigation; therefore, the Disclosure Statement is confidential and protected by the joint prosecutorial privilege.

## GOVERNMENT HEALTHCARE PROGRAMS

6.     Title XVIII of the Social Security Act, U.S.C. §§ 1395, *et seq.,* establishes the Health Insurance for the Aged and Disabled Program, known as the Medicare program. The Secretary of the United States Department of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS").

7.     The Medicare program is comprised of four parts. Medicare Part A ("Hospital Insurance") provides basic insurance for the costs of hospitalization and post-hospitalization care. 42 U.S.C. §§ 1395c-i-5. Medicare Part B ("Medical Insurance") is a federally subsidized, voluntary insurance program that covers the fee schedule amount for doctors' services, outpatient care, medical supplies, and laboratory services. 42 U.S.C. §§ 1395j-w-5. Medicare Part C ("Medicare Advantage Plans") is a plan offered by private insurers that contract with Medicare to provide Part A and Part B benefits. 42 U.S.C. §§ 1395w-21-w-28. Medicare Part D ("Prescription Drug Coverage") is a plan offered by private insurers approved by Medicare to provide basic insurance for prescription drugs. 42 U.S.C. §§ 1395w-101-w-154.

8.     Reimbursement for Medicare Part A claims is made by the United States through CMS. Hospitals submit Medicare Part A claims directly to CMS, which in turn makes a standard, bundled payment based on a DRG diagnostic code.

9.     Reimbursement for Medicare Part B claims is made by the United States through CMS. CMS, in turn, contracts with fiscal intermediaries to administer and pay Medicare Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In

this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R. § 421.5(b). Separate payments are made for each CPT procedural code listed on the Medicare Part B claims. *See* 45 C.F.R. §§ 162.1000, 162.1002, 162.1011 (adopting the Current Procedural Terminology Coding Manual published by the American Medical Association (the "CPT Manual")).

10.     Reimbursement for Medicare Part C claims is made by the United States through CMS. CMS makes fixed monthly payments to each Medicare Choice organization for each enrolled individual, i.e., a capitated payment.

11.     Reimbursement for Medicare Part D claims is made by the United States through CMS.

12.     CMS, which administers Medicare and Medicaid, selects Prescription Drug Sponsors ("Plan Sponsors") to provide drug coverage to Part D beneficiaries. Plan Sponsors are responsible for the administration and payment of individual prescription drug claims, but most contract with pharmacy benefit managers ("PBM"), which enter into arrangements with the pharmacies that will actually fill prescriptions. The PBMs then further subcontract with those individual pharmacies. Separate payments are made for each NDC listed on the Medicare Part D claims.

13.     Plan Sponsors and PBMs are private entities that have contracted with the government (in the case of Plan Sponsors) and subcontracted with a government contractor (in the case of PBMs).

14.     As part of the enrollment process for the Medicare program, providers certify

that they agree to abide by the Medicare laws, regulations, and program

instructions and that they understand that payment of a claim by Medicare is

conditioned upon the claim and the underlying transaction complying with such

laws, regulations, and program instructions (including, but not limited to, the

Federal Anti-Kickback Stature, 42 U.S.C. section 1320a-7b(b) (section 1128B(b) of

the Social security Act) and the Physician Self-Referral Law ("Stark Law"), 42

U.S.C. section 1395nn (section 1877 of the Social Security Act)).

15.     Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.*, establishes the

Medicaid program, a federally assisted grant program for the States. Medicaid

enables the States to provide medical assistance and related services to needy

individuals. CMS administers Medicaid on the federal level. Within broad federal

rules, however, each state decides who is eligible for Medicaid, the services covered,

payment levels for services, and administrative and operational procedures.

16.     At all times relevant to this Complaint, the United States provided funds to

the States through the Medicaid program pursuant to Title XIX of the Social

Security Act, 42 U.S.C. §§ 1396, *et seq.* Enrolled providers of medical services to

Medicaid recipients are eligible for payment for covered medical services under the

provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act.

17.     TRICARE is a government-funded program that provides medical benefits to

retired members of the Uniformed Services and to spouses and children of active

duty, retired, and deceased members, as well as reservists who were ordered to

active duty for thirty (30) days or longer. The program is administered by the Department of Defense and funded by the federal government.

18.     Together, the programs described above, and any other government-funded healthcare programs, are referred to herein as "Government Healthcare Programs" or "GHPs."

## THE ANTI-KICKBACK STATUTE

19.     The Anti-Kickback Statute ("AKS") prohibits the knowing and willful offering, paying, solicitation, or receipt of remuneration in cash or in kind to induce or reward patient referrals or the generation of business involving any item or service payable by Federal Insurance, including Medicaid, Medicare, and Tricare. 42 U.S.C. §1320a–7b.

20.     Pursuant to the AKS, a claim that includes items or services resulting from a violation of the AKS constitutes a false or fraudulent claim for purposes of the federal FCA. 42 U.S.C. § 1320a-7b(g).

21.     Compliance with the AKS is material to claims for payment pursuant to the CMS-855O Medicare Enrollment Application, which conditions payment on compliance with the statute, and case law that has determined that violations of the AKS are material. *See U.S. ex rel. Lutz v. Berkeley Heartlab, Inc.*, 2017 U.S. Dist. LEXIS 138722, at *9 (D.S.C. Aug. 27, 2017) (applying common sense and weight of authority).

22.     The State of Florida has its own Anti-Kickback Statute, Florida Administrative Code 59G-1.050(11), which, *inter alia*, prohibits payment in return

for referring an individual to a person for furnishing any service for which payment

may be made under the Florida Medicaid program.

## PARTIES

23.　Sebastian operates a retail pharmacy at 13403 U.S. Highway 1, Sebastian,

Florida 32958.

24.　Sebastian is owned and operated by Defendant Alkesh and his wife,

Defendant Hina.

25.　The Shastris are residents of the State of Florida.

26.　Neither of the Shastris are licensed pharmacists.

27.　Approximately 75-80% of Sebastian's clientele are Medicare or Medicaid

beneficiaries.

28.　Sebastian's license was issued by the Board of Pharmacy on October 5, 2017.

29.　Defendant Malabar operates a retail pharmacy since 2010 at 930 Malabar

Rd. SE #1, Palm Bay, Florida 32907.

30.　Malabar is one of the pharmacies the Shastris previously opened and then

sold.

31.　Defendant Titusville operates a discount pharmacy at 2175 Cheney Hwy,

Titusville, Florida 32780.

32.　Titusville is another of the pharmacies that the Shastris previously opened

and sold.

33.    Relator James Mezheritskiy, Pharm.D., R.Ph., is a registered pharmacist who worked at Sebastian from November 2018 to March 1, 2019, having been forced out due to his concerns about Sebastian's fraudulent practices.

34.    Relator Jeffrey Boudette, R.Ph., is a registered pharmacist who worked at Sebastian from February 26 to May 3, 2019, when he was terminated for attempting to stop Sebastian staff from illegally billing prescriptions.

35.    Marisella Mendez ("Mendez"), a nonparty, is a pharmacy technician at Sebastian who has a longstanding relationship with Defendant Alkesh and has helped him open multiple pharmacies, including Sebastian.

### FACTUAL ALLEGATIONS

36.    When Relator Boudette arrived in late February 2019, he observed that none of the employees had undergone HIPAA training, the pharmacy was missing basic, required NECC equipment such as a mortar and pestle, licenses were not displayed, some licenses were out of date, there were no name tags, there was no consultation area, and there was no work flow or clear job duties.

37.    In fact, pharmacy technicians ("techs"), including Defendant Alkesh and Mendez, were giving advice to patients concerning both medication and over the counter treatments.

38.    On or about March 25, 2019, Sebastian underwent a routine Board of Pharmacy inspection. The inspector determined that the pharmacy lacked satisfactory policy and procedures with respect to dispensing of controlled

substances and further noted that unlicensed personnel should never be in the Prescription Department area.

39.   As a result of this inspection, Relator Boudette pulled Sebastian's policies and procedures and realized many were incomplete or missing.

40.   For example, there were no policies and procedures in place for deliveries, and if a delivery had not been made by the end of the workday, employees were taking prescriptions home with no accountability.

41.   Class II, III, IV, and V prescriptions were a disaster, files lacked even basic information such as doctor's DEA number, patient name, address and driver's license numbers, etc., and controlled substance prescriptions were being put in the pick-up bins outside the view of the pharmacist.

42.   Of great concern, the staff members were processing prescriptions for controlled substances before the Pharmacist in Charge ("PIC") could perform the required Eforce/PDMP check, and were all working under the pharmacist's login, which meant that anyone could perform computer tasks that only a pharmacist should be doing.

43.   During his tenure, Relator Mezheritskiy reported this issue repeatedly to PrimeRx, the software vendor, and had the system changed to display technician IDs, but after each such call, Defendant Alkesh would reset the system to record only one set of initials.

44.   Overall, daily operations were run by Defendant Alkesh, who even wore a "manager" name tag and, as discussed below, had told Relator Mezheritskiy that he

was a "doctor of pharmacy," as well as telling both Relators that he was a

pharmacist, when in fact he was not even a credentialed technician.

### Illegally Enrolling Part D Recipients into Manufacturer's Coupon Discounts by Using Fake Codes.

45.    The AKS prohibits anyone—drug manufacturers included—from giving a

patient anything of value that could result in referrals for items or services that are

paid for by a Government Healthcare Program ("GHP").

46.    Manufacturer's coupons and rebates, which typically are intended to cover

the cost of a copay for an expensive drug (referred to herein as "copay programs"),

are prohibited by the AKS because they entice GHP recipients to choose more

expensive medications over generics, leading to higher spending for the programs.

47.    Moreover, such copay programs are typically short-lived and have annual

maximums, which leave the GHPs stuck with the remaining fee for the life of the

prescription. Accordingly, GHP recipients cannot both use Medicare Part D and also

take advantage of copay programs.

48.    In in order to submit a claim on a copay program in PrimeRx, Sebastian's

software system, the person entering the prescription must input the code for the

customer's "commercial or private insurance" and submit the claim to this primary

insurance via the PBM system.

49.    If the PBM recognizes the insurance, then the system will permit the claim to

be submitted to the copay program.

50.     Based on what the primary insurance pays (and thus what the remaining copayment is), the manufacturer's system then determines how much copay assistance the customer will receive.

51.     If, however, the number that is entered is **not** recognized by the PBM as a valid commercial or private insurance plan, the PBM system will not permit the claim to be submitted to the copay program.

52.     Moreover, if the birthdate of the customer shows that she is eligible for Part D, the system will also reject the claim and not allow it to be submitted to the copay program.

53.     Defendant Alkesh gets around these PBM system safeguards in two ways. First, he enters a bogus code for customer's insurance: Plan Code AD8, ID number TE720702528, Group Number 849014 (the "AD8 Code"). Second, he changes the customer's date of birth in the system so that the customer appears to be ineligible for Part D.

54.     While the AD8 Code is not a valid insurance code (and, more importantly, is not actually the customer's insurance), it is nevertheless "recognized" by the PMB system.

55.     This allows Defendant Alkesh to then submit the claim to the copay program.

56.     Because the code is bogus, the result is a denial of claim. The manufacturer's copay program then authorizes the largest possible amount of assistance permitted under its copay program.

57.     Defendant Alkesh then collects this copay assistance, changes the birth date back in the system, and gives the customer the medication for "free" (or very low cost).

58.     Finally, Defendant Alkesh *also* bills the customer's actual insurance, including GHPs, for the drug.

59.     Defendant Alkesh then *also* bills the customer's insurance, including GHPs, for monthly refills, including those that occur after the copay program has run its course, which is generally after one year of monthly refills.

60.     If a customer does not have insurance at all, and so cannot qualify for the copay programs, Defendant Alkesh uses this same scheme to enroll the customer in the copay program and simply collects the amount provided by the program.

61.     This scheme allows the Shastris to capture customers, bring all of their prescriptions over to Sebastian, show a booming business, and sell off the business before the scheme is discovered.

62.     Relator Mezheritskiy became aware of this scheme in December 2018, about a month after he joined Sebastian.

63.     When Relator Mezheritskiy confronted Defendant Alkesh, he was told that Defendant Alkesh would not stop because he "would lose three-fourths of [his] customers" if he stopped using the illegal enrollment.

64.     Relator Mezheritskiy attempted to put a stop to the practice but over his express orders, he almost immediately saw another enrollment come through. At that point, he realized he could not stop the fraud and had to seek another job.

65.    During Relator Mezheritskiy's notice period was one of the times when Defendant Hina was present at Sebastian. She worked behind the counter, in the Prescription Department area, actively performing the duties of a technician such as counting tablets/capsules, filling and labeling prescription vials, and stocking the prescription drug shelves.

66.    Like Defendant Alkesh, however, Defendant Hina is unlicensed and should not have been in this restricted area.

67.    Relator Boudette began work in late February/early March, and at first was distracted by trying to correct the myriad noncompliance issues he found. But by April, Relator Boudette had also begun to suspect fraud was occurring.

68.    On one occasion, he opened the refrigerator in the pharmacy and commented to Mendez on the high number of Lantus refills that were awaiting pick up. In response, Mendez said that it was "all fake," because the patients did not qualify for the program, and that Defendant Alkesh was falsifying the responses to questions on the enrollment questionnaire. She also said that "without the coupons, [Defendant Alkesh] has nothing."

69.    Upon reflection, Relator Boudette realized this matched what he had personally observed: on several occasions, he had seen Defendant Alkesh filling in customer information at the computer when the customer was not even at the counter.

70.    Relator Boudette then confronted Defendant Alkesh and told him that if Defendant Alkesh wished to enroll a customer in a manufacturer savings program,

he must first ask the patient the questions from the required questionnaire.
Boudette also made it clear that patients enrolled in any state or federal insurance
program, including Medicare Part D and Medicaid, would not be eligible, and so
most patients age 65 or older would likely not be eligible. He reiterated that the
customer had to be the one to respond to the questions, not Defendant Alkesh.

71.    Despite these instructions, Defendant Alkesh continued to enroll ineligible
customers.

72.    Relator Boudette personally witnessed Defendant Alkesh enrolling a patient
who was not eligible and, when Boudette asked the customer if she had been asked
to answer the enrollment questions, she hesitated, looked at Defendant Alkesh,
then said "two [questions]."

73.    The exchange with Mendez and the ongoing fraud by Defendant Alkesh
alarmed Relator Boudette, and he reached out to Relator Mezheritskiy to find out
whether Relator Mezheritskiy knew anything about these issues.

74.    The two met in person, and Relator Mezheritskiy confirmed that he believed
Defendant Alkesh was fraudulently enrolling patients in copay programs. He told
Relator Boudette that he was able to do so by using a bogus code, and told him to
look for a change showing insurance "AD8" with the copay being charged to "HDI"
in the system, because HDI is one of the codes in PrimeRx that indicates copay
assistance is coming from a manufacturer's program.

75.    The day after this conversation with Relator Mezheritskiy, a claim came
through exactly as described.

76.    Relator Boudette then spoke again about this scheme with Mendez, who admitted that it had been happening and that she was aware of the bogus code. She was also able to show Relator Boudette where to look to see the AD8 and HDI codes that Relator Mezheritskiy had mentioned.

77.    Relator Boudette reiterated to Mendez that offering these drugs with zero or reduced copay to ineligible customers was fraud, and instructed Mendez to not process any more claims for ineligible patients.

78.    After trying to curtail this scheme and failing, and still seeing many "AD8 to HDI" prescriptions in the system, Relator Boudette confronted Defendant Alkesh yet again and asked him directly what AD8 was, in the presence of Mendez, just days before Relator Boudette was terminated.

79.    Relator Boudette asked whether there was any insurance actually associated with the AD8 number and whether the customer was aware that he was supposedly enrolled in the AD8 insurance program.

80.    In response, all Defendant Alkesh volunteered was that he got the AD8 code "off the internet" and that "everyone else" was doing it.

81.    By "everyone," Relator Boudette understood Defendant Alkesh to be referring to Defendants Malabar and Titusville, as well as Babcock Pharmacy.

82.    Relator Boudette responded that he did not believe either the manufacturer or the government would consider "AD8" to be "commercial or private insurance," and so everyone must stop using the code until Defendant Alkesh could demonstrate that it was legitimate.

83.    Specific examples of ineligible enrollments are as follows:

    a.  Lantus Solostar Injector pen at 100U/ML that was dispensed to customer JC. The customer was then enrolled in the Lantus coupon program by using AD8 as his insurance (which was false) in order to enroll him in the program ("PATTYPE AD8 [changed to] HD1"). No copay was charged for this transaction, and over time it appears that total copays of more than $453.03 were written off by technician Mendez.

    b.  Another Lantus Solostar Injector pen was dispensed to customer PH. PH, who was 72 years old at the time and was enrolled in the Lantus coupon program by Defendant Alkesh, was a Part D recipient. His birthdate in 1947 would certainly have led to a rejection in the system had Alkesh not changed it. When Relator Boudette asked the customer's wife, who manages his care, about the prescription, she shared that Defendant Alkesh had told her "if he gets the quikpen, the Lantus is free." No copay was charged.

    c.  A prescription for Myrbetriq dispensed to customer BW under the manufacturer's coupon program (see "HD1" next to her name on the lower left). Again, with a birthdate of 1934, BW would have been rejected for the copay program unless Defendant Alkesh changed her birthdate in the system.

84.     Toward the end of April 2019, it seemed that Mendez was following Relator Boudette's instructions and was no longer submitting ineligible claims.

85.     Drugs like Eliquis and Lantus that before had come through with low or no copay began to come through with very high copays.

86.     It was even more noticeable on or about the week beginning April 29, 2019.

87.     On Friday, May 3, 2019, in part of the email that terminated Relator Boudette's employment, Defendant Alkesh defended his use of the AD8 code, stating:

> Ad8 is not private insurance. The bin pcn and group is what makes it private not the name. You can change the name to what ever [sic] you want. You do not want to hear this because you never took the time to look for a coupon for a patients [sic] instead you have played FBI by asking questions that make customers like [sic] you are interrogating them. Patients have complained numerous times about this and they do not come in when you are there. I cannot afford that.

88.     Thanks to this scheme and others, explained below, Sebastian grew exponentially. Relator Boudette recalls one day in which the pharmacy handled 200 prescriptions – an unheard-of volume for a pharmacy that had only been open for one year.

***Discount Cash Program***

89.     Defendant Alkesh advertises and offers a "discount cash price" for certain drugs, in tiers.

90.     Specifically, under this program, Sebastian offers:

- A thirty-day supply of diabetes and blood pressure medicine (Glipizide, Metformin, Lisinopril, and Amlodipine) and certain antibiotics (amoxicillin, Bactrim/septra, cephalexin, and ciprofloxacin) **for free**.

- A thirty-day supply of aspirin, atenolol, carvedilol, citalopram, clonidine, cyclobenzaprine, furosemide, lisinopril HCTZ, meloxicam, metoprolol tartrate, naproxen, and simvastatin **at $2.00**.

- A thirty-day supply of acyclovir, albuterol, alendronate SOD, benztropine, certirizine, Claritin LIQ, clomiphene (Clomid), famotidine, fluconazole, fluoxetine, folic acid, guanfacine, haloperidol, hydrochloride, prescription strength ibuprofen, indapamide, ipratropium, Lamisil, loratadine, lovastatin, metformin, methocarbamol, metoclopramide, omeprazole, paroxetine, prenatal prescriptions, prochlorperazine, sertraline, terazosin, and warfarin **at $4.00**.

- A thirty-day supply of amiodarone, benazepril, bupropion, diclofenac, gemfrozil, hydralazine, indomethacin, ketoconazole, lactulose, Levaquin, losartan, pantoprazole, Plavix, tamsolulosin, tripack, Zofran, and z-pack **at $9.00.**

- A thirty-day supply of acyclovir, benicir, bupropion, crestor, duoneb, finasteride, gabapentin, hydroxyzine, lamicatal, levocetirizine, Lexapro, Lipitor, nystatin, omeprazole, potassium, risperidone, ropinorole, and Zithromax **at $15**.

- A thirty-day supply of Augmentin, Actos, Cymbalta, micardis, Macrobid, Medrol dose pack, sildeniful, Seroquel, singulair, sumatriptan, valsartan, valsartan HCTZ, and zypreza **at $25**.

- A free nebulizer machine with a prescription for nebulizer solution.

- $15 for 100 diabetic test strips every month.

- Free $5 over the counter product for every prescription transferred.

91.   Notably, although there is a caveat noted with respect to availability in the formulary, there is no caveat or disclaimer with respect to GHPs.

92.   This scheme is also simple: first, Defendant Alkesh charges the customer the discounted cash price—if any—instead of the copay.

93.   Second, and unbeknownst to the patient, Defendant Alkesh also bills the person's insurance for the same medication, including GHPs. In other words,

Defendant Alkesh creates his own "cash price" copay for the customers, but still bills insurance, including GHPs, for the price of the drug. He does this to entice customers to use Sebastian rather than its competitors.

94.    The flyers advertising the program are mailed out, taped onto the front window of Sebastian Discount Pharmacy, left in stacks to be picked up, mailed to doctors, and distributed at physician group meetings.

95.    Once Defendant Alkesh has enticed customers to allow him to fill one prescription for free, he then calls and transfers all of that customer's prescriptions without customer approval.

96.    In addition, because Sebastian allows techs to accept verbal orders over the phone, Defendant Alkesh writes up bogus prescriptions for insulin supplies (such as alcohol, meters, test strips, etc.) and uses the customer's doctor's name, which he will then fill at no cost to the customer.

*Waiving Copays*

97.    As part of both schemes above, and just to entice customers, Sebastian routinely waives copays for many of its customers without any financial hardship review.

98.    Waiving copays is not only a kickback to the customer, incentivizing them to be customers, it also changes the "reasonable charge" of the drug, which is based on actual charges for the drug.

99.    Medicare will typically pay 80% of a pharmacy's "reasonable charge" for covered prescriptions; the patient is expected to pay the remainder as a copay. If a

pharmacy waives a 20% copay, then the reasonable charge is actually 20% lower than what is reported to Insurance.

*Unlicensed Personnel Dispensing Prescriptions*

100. At their first in-person meeting, when he was interviewing Boudette for the positions of pharmacist and pharmacy manager, Defendant Alkesh informed Boudette that he was a pharmacist as well as the owner of Sebastian, and further stated that he owned eight more pharmacies and was "part of a large network of many stores."

101. Defendant Alkesh also routinely held himself out to customers as a pharmacist, telling some (in Relator Mezheritskiy's hearing) that he had a doctorate in pharmacology. It was not unusual for customers to come in and ask where "Doc" was, referring to Defendant Alkesh. Both Relators heard customers refer to Defendant Alkesh as "Doc," and Relator Boudette was told by a customer that Defendant Alkesh had claimed to have a doctorate.

102. In fact, however, Defendant Alkesh has no doctorate in pharmacology, is not a pharmacist, and was not even a registered pharmacy technician during most of Relators' tenures.

103. Nevertheless, Relators Mezheritskiy and Boudette both personally witnessed "Doc" counseling patients, taking calls from physicians, and accepting and transferring prescriptions – all of which are tasks that should not be performed other than by a pharmacist.

104.    From time to time, Sebastian seems to have operated without a PIC. Relator Mezheritskiy was told by Mendez that, prior to Relator Mezheritskiy's tenure, there was a pharmacist who was a friend of Defendant Alkesh, but who also left after only a few months, saying, "you [Alkesh] cannot do this."

105.    Relator Mezheritskiy further recalls that on one occasion, when he was late to open the store, the store was opened by Mendez in violation of law.

106.    When Relator Boudette ultimately discovered that Defendant Alkesh was not a pharmacist or even a technician, Defendant Alkesh next claimed that he was in training in the "Sebastian Discount Pharmacy Training Program," which had been approved by the Pharmacy Association.

107.    Relator Boudette asked Defendant Alkesh for documentation on the training program and proof of approval by the Board of Pharmacy.

108.    When he did not receive it, Relator Boudette contacted the Board himself, at which point he discovered that there was no such Board-approved training program.

109.    Accordingly, Relator Boudette, as manager, told Defendant Alkesh that he could not work at Sebastian until he was enrolled in a Board-approved program, which he did on or about April 22, 2019.

110.    Prior to that time, Defendant Alkesh had been operating with no licensure whatsoever.

111.    In addition, Relators witnessed other techs operating well outside what they were permitted to do by law.

112.    For example, Mendez took "prescriptions" over the phone. On one occasion,

Relator Boudette noticed a prescription that clearly lacked necessary information

required by law, such as patient address, doctor address and telephone number,

notation about who had called with the order, doctor DEA number, and pharmacist

initials. Moreover, the directions were unclear, and the prescription called for

eleven refills. It also included one prescription for Lorazepam, a controlled

substance, which should be on a separate prescription. Most critically, the dosage

for metoprolol, a cardiac medication, had been written incorrectly, which was only

discovered when Relator Boudette called the doctor's office to obtain an entirely new

prescription.

113.    These types of errors were common when Relator Boudette took over

managing the pharmacy, and upon information and belief continued after he left.

114.    As to controlled substances, there are two ways for a pharmacy to order Class

II controlled substances. The first is through online ordering via a Controlled

Substance Ordering System ("CSOS"). To use a CSOS, the pharmacy DEA

registrant (here, Hina) must name a CSOS coordinator and grant that person power

of attorney for DEA purposes. The CSOS coordinator must be an employee of the

company, but does not have to be a pharmacist. This CSOS coordinator then

oversees the pharmacy's participation on the CSOS.

115.    The second means of ordering Class II controlled substances is via paper

order, which is submitted to the wholesaler on DEA's Form 222. This Form 222

shows that the order is authorized by the registrant.

116.   Up until mid-April 2019, Defendant Alkesh was ordering Class II substances online via the CSOS.

117.   This is problematic because although Alkesh would theoretically be permitted to order controlled substances with proper power of attorney, in order to place the orders Alkesh had to be physically within the Prescription Department area, a portion of the pharmacy that, as an unlicensed person, he should not have been inside.

118.   On about April 12, 2019, Alkesh approached Relator Boudette about becoming the CSOS coordinator. Relator Boudette stated that he was not interested in becoming the CSOS coordinator, but he agreed to apply for power of attorney. This was reiterated by email on April 15, 2019, after Defendant Alkesh stated in an April 14, 2019, email to Relator Boudette that "we are stop [sic] using CSOS ordering until your application gets approved. We have 222 in safe."

119.   On June 18, 2019, Relator Boudette's application for power of attorney was denied via email, because "CSOS coordinator does not exist for DEA No. FS7255107" (DEA registration number for Sebastian), which raises the question of how any ordering online had occurred if there was no CSOS coordinator designated.

120.   On July 12, Relator Boudette received another email from the DEA confirming receipt of an apparently-renewed application, which he had known nothing about.

121.   Relator Boudette called the DEA to inform them that he no longer worked at Sebastian and requested that the application be withdrawn, but on July 15, 2019, he received another DEA email indicating that the application had been approved.

*Medication Therapy Management ("MTM") Fraud*

122.   Under 42 C.F.R. § 423.153(d), all Part D sponsors must have established an MTM program that "ensures optimum therapeutic outcomes for targeted beneficiaries through improved medication use; reduces the risk of adverse events; is developed in cooperation with licensed and practicing pharmacists and physicians; describes the resources and time required to implement the program if using outside personnel and establishes the fees for pharmacists or others; may be furnished by pharmacists or other qualified providers; may distinguish between services in ambulatory and institutional settings; is coordinated with any care management plan established for a targeted individual under a chronic care improvement program ('CCIP')."

123.   Part D enrollees with multiple chronic diseases who are taking multiple Part D drugs and are likely to incur annual costs for covered Part D drugs that exceed a predetermined level are targeted for the MTM programs, as described in § 423.153(d)(1), and are enrolled using an opt-out method. Enrollees receive, *inter alia*, an annual comprehensive medication review ("CMR"), which is interactive, person to person, and performed by a pharmacist or other qualified provider with an individualized, written summary in CMS's standardized format, and quarterly targeted medication reviews ("TMRs") with follow up interventions when necessary.

Examples of "qualified providers" include pharmacists, physicians, and registered nurses. Nonqualified providers include pharmacy technicians, pharmacy student/interns, and case workers may be used as staff and only assist qualified providers. A pharmacist who performs MTM services is paid via the pharmacy's National Provider Identifier ("NPI").

124.   Relator Mezheritskiy is trained and certified to perform MTM. When he was first hired at Sebastian, he offered his services to Defendant Alkesh and was flatly refused. A few days before he left, he observed Mendez performing an MTM on the Mirixa platform.

125.   Defendant Alkesh and his techs are performing MTMs to the tune of a thousand dollars a month or more. Each of these is a false claim because Defendant Alkesh is not a pharmacist and the techs are not under the direct supervision of a pharmacist.

**COUNT I**
**VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)**
**(All Defendants)**

126.   Relators hereby incorporate and reallege herein the allegations set forth in Paragraphs 1-125.

127.   As set forth above, Defendants Sebastian Pharmacy, LLC, d/b/a Sebastian Discount Pharmacy, Alkesh Shastri, Hina Shastri, Malabar Pharmacy, LLC, d/b/a Malabar Discount Pharmacy, and Titusville Pharmacy, LLC, d/b/a Titusville Discount Pharmacy knowingly presented or caused to be presented false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

128.   Due to Defendants' conduct, the United States Government has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim. 31 U.S.C. § 3729.

129.   Relators are entitled to reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d)(1).

**COUNT II**
**VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)**
**(All Defendants)**

130.   Relators hereby incorporate and reallege herein the allegations set forth in Paragraphs 1-125.

131.   As set forth above, Defendants Sebastian Pharmacy, LLC, d/b/a Sebastian Discount Pharmacy, Alkesh Shastri, Hina Shastri, Malabar Pharmacy, LLC, d/b/a Malabar Discount Pharmacy, and Titusville Pharmacy, LLC, d/b/a Titusville Discount Pharmacy knowingly made, used, or caused to be made or used, false records or statements material to numerous false claims, in violation of the federal FCA, 31 U.S.C. § 3729(a)(1)(B).

132.   Due to Defendants' conduct, the United States Government has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim. 31 U.S.C. § 3729.

133.   Relators are entitled to reasonable attorneys' fees, costs, and expenses. 31 U.S.C. § 3730(d)(1).

## COUNT III
## VIOLATION OF FLORIDA FALSE CLAIMS ACT
## SECTION 68.082(2)(a), FLORIDA STATUTES
## (All Defendants)

134.   Relators hereby incorporate and reallege herein the allegations set forth in Paragraphs 1-125.

135.   As set forth above, Defendants Sebastian Pharmacy, LLC, d/b/a Sebastian Discount Pharmacy, Alkesh Shastri, Hina Shastri, Malabar Pharmacy, LLC, d/b/a Malabar Discount Pharmacy, and Titusville Pharmacy, LLC, d/b/a Titusville Discount Pharmacy knowingly presented, or caused to be presented to the Florida Medicaid program numerous false or fraudulent claims for payment or approval, in violation of section 68.082(2)(a), Florida Statutes.

136.   Due to Defendants' conduct, the State of Florida has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim. Section 68.082(2), Florida Statutes.

137.   Relators are entitled to reasonable attorneys' fees, costs, and expenses. Section 68.085, Florida Statutes.

## COUNT IV
## VIOLATION OF FLORIDA FALSE CLAIMS ACT
## SECTION 68.082(2)(b), FLORIDA STATUTES
## (All Defendants)

138.   Relators hereby incorporate and reallege herein the allegations set forth in Paragraphs 1-125.

139.   As set forth above, Defendants Sebastian Pharmacy, LLC, d/b/a Sebastian Discount Pharmacy, Alkesh Shastri, Hina Shastri, Malabar Pharmacy, LLC, d/b/a Malabar Discount Pharmacy, and Titusville Pharmacy, LLC, d/b/a Titusville

Discount Pharmacy knowingly made, used, or caused to be made or used, false records or statements material to numerous false claims, in violation of section 68.082(2)(b), Florida Statutes.

140.    Due to Defendants' conduct, the State of Florida has suffered substantial monetary damages and is entitled to recover treble damages and a civil penalty for each false claim. Section 68.082(2), Florida Statutes.

141.    Relators are entitled to reasonable attorneys' fees, costs, and expenses. Section 68.085, Florida Statutes.

**COUNT V**
**VIOLATION OF 31 U.S.C. § 3730(h)**
**RETALIATION AGAINST RELATOR MEZHERITSKIY**
**(Defendants Sebastian Pharmacy, LLC, d/b/a Sebastian Discount**
**Pharmacy, Alkesh Shastri, and Hina Shastri)**

142.    Relators hereby incorporate and reallege herein the allegations set forth in Paragraphs 1-33, 35-125.

143.    Over the few months that Relator Mezheritskiy worked at Sebastian, he became increasingly distressed with the degree of fraud going on.

144.    His efforts to stop the fraud were rebuffed, and Alkesh and Hina caused Sebastian to fill prescriptions without his knowledge or review. His role as the PIC was marginalized and reduced until he felt completely powerless.

145.    Ultimately, having tried repeatedly to stop the fraud and failing, he was forced to resign, citing "business ethics" in his resignation letter.

146.    Defendants Sebastian Pharmacy, LLC, d/b/a Sebastian Discount Pharmacy, Alkesh Shastri, and Hina Shastri violated Relator Mezheritskiy's rights pursuant to 31 U.S.C. § 3730(h) by retaliating against him for lawful acts done by him in

furtherance of an action under the federal FCA and other efforts to stop one or more violations alleged in this action.

147.    As a result of Defendants Sebastian and the Shastris' actions, Relator has suffered damages in an amount to be shown at trial.

**COUNT VI**
**VIOLATION OF 31 U.S.C. § 3730(h)**
**RETALIATION AGAINST RELATOR BOUDETTE**
**(Defendants Sebastian Pharmacy, LLC, d/b/a Sebastian Discount**
**Pharmacy, Alkesh Shastri, and Hina Shastri)**

148.    Relators hereby incorporate and reallege herein the allegations set forth in Paragraphs 1-32, 34-125.

149.    Over the few months that Relator Boudette worked at Sebastian, he became increasingly uncomfortable with the degree of fraud going on.

150.    On March 20, 2019, having become aware of the many deficiencies at Sebastian, Relator Boudette texted Defendant Alkesh at 11:46 pm and stated, "I need to sit down with Hina. There are serious matters she as the registrant needs to be aware of." Defendant Alkesh replied at 2:43 am, "she will not sit down with you."

151.    On April 27, 2019, Relator Boudette's handwritten notes reflect that it was a "particularly alarming day. Numerous patients – all ineligible – enrolled in manufact [sic] savings program. Some patients with monthly fills over many months-year. This has been going on for close to a year at least. Degree of fraud is scary. Will have to report this! Very distressing to be here – hard to focus."

152.    On Thursday, May 2, 2019, Relator Boudette wrote to Defendant Alkesh and stated, *inter alia*:

A great deal of my time has been spent trying to correct the multitude

of inadequacies in your pharmacy since I began.

No tech help after 4 hasn't helped.

Of greatest concern is your knowingly enrolling ineligible patients in the manufacture savings programs, apparently in an effort to gain zero or low copays and gain customers.

Others have told me about you doing this. I have witnessed you processing theese [sic] claims myself before I was made aware of what was really going on.

This was first brought to my attention by someone else.

One individuals [sic] words were "it's all fake".

I have spoken with customers who said you enrolled them. In their mind they could not understand how other pharmacies told them they were ineligible, and at your store got free Lantus.

A member in the medical community has expressed concern over losing customers. Customers have reported back as to why they left.

My belief is that your system is infested with an extremely large number of fraudulent false claims.

Claims that violate Federal Law.

This is extremely alarming.

Hina needs to be made aware.

Please have her call me.

153.   The next day, Relator Boudette was terminated via email, which accused Relator Boudette of "playing FBI" and stated emphatically that "[i]f you think we are doing something wrong then you should not be here. Effective immediately your employment with Sebastian Pharmacy will be terminated."

154.   Defendants Sebastian Pharmacy, LLC, d/b/a Sebastian Discount Pharmacy, Alkesh Shastri, and Hina Shastri violated Relator Boudette's rights pursuant to 31 U.S.C. § 3730(h) by retaliating against him for lawful acts done by him in furtherance of an action under the federal FCA and other efforts to stop one or more violations alleged in this action.

155.   As a result of Defendants Sebastian and the Shastris' actions, Relator has suffered damages in an amount to be shown at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relators pray for judgment against Defendants:

(a) awarding the United States treble damages sustained by it for each of the false claims;

(b) awarding the United States the maximum civil penalty for each of the false claims and statements;

(c) awarding the State of Florida treble damages sustained by it for each of the false claims;

(d) awarding the State of Florida the maximum civil penalty for each of the false claims and statements;

(e) awarding Relator thirty percent (30%) of the proceeds of this action and any alternate remedy or the settlement of any such claim;

(f) awarding Relator Boudette all relief available, including special damages, resulting from retaliation pursuant to 31 U.S.C. § 3730(h);

(g) awarding Relator Mezheritskiy all relief available, including special damages, resulting from retaliation pursuant to 31 U.S.C. § 3730(h);

(h) awarding Relators litigation costs and reasonable attorneys' fees; and

(i) granting such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Relators hereby respectfully demand trial by jury on all issues and counts triable as of right before a jury.

Dated:   August 27, 2019

Respectfully submitted,

*Jill S. Schwartz, Esquire*

Jill S. Schwartz, Esquire
Florida Bar No. 523021
John M. Hunt, Esquire
Florida Bar No. 91168
**Jill S. Schwartz & Associates**
655 West Morse Boulevard, Suite 212
Winter Park, Florida 32789-3745
Telephone:  (407) 647-8911
Facsimile:  (407) 628-4994
jschwartz@schwartzlawfirm.net
jhunt@schwartzlawfirm.net

Julie Bracker, Esquire
Georgia Bar No. 073803
Jason Marcus, Esquire
Georgia Bar No. 949698
**Bracker & Marcus LLC**
3225 Shallowford Road, Suite 1120
Marietta, Georgia 30062
Telephone:  (770) 988-5035
Facsimile:  (678) 648-5544
Julie@fcacounsel.com
Jason@fcacounsel.com